RICHARD H. BRADFORD, ADMINISTRATOR, ET AL., APPELLANTS, *vs.* WILLIAM MARVIN & NOAH M. MARTIN, APPELLEES.

The right of the vendor to an equitable lien upon the lands sold is a right that exists, but may be waived, if the vendor takes a collateral security, binding others as well as the vendee.

The taking of separate or independent security, if it is not *per se* a waiver of the vendor's lien, is at least *prima facie* evidence of such waiver ; and the *onus* is upon the vendor, to show that it ought not to have that effect.

Where the vendor simply takes the note or bond of the vendee, and makes a conveyance, he retains a specific lien upon the land, subject, however, to be defeated by the intervention of creditors or purchasers without notice.

Where the vendor has parted with the title, the surety has no right to claim to be·substituted to the rights of the creditor, unless he has paid the money— and even then, he has no greater rights than the creditor himself had.

The surety may compel a sale of the lands to save himself harmless, where the title has been retained by the vendor.

Marvin and Martin, in the year 1844, filed their bill of complaint in the late Superior Court of St. John's County, against Mary Eliza Read, Teresa Bellamy Read and Richard H. Bradford, administrator of the estate of Leigh Read, setting forth and showing that, on the 12th day of March, eighteen hundred and thirty-nine, the said Marvin was seized and possessed of three thousand five hundred acres of land, being a part and portion of an undivided tract of four thousand acres, ceded by the Spanish Government to one Don Francisco Roman Sanchez, and described in said cession as being situate ten miles to the westward of the Alachua road, leading to St. Mary's, and bounded on the north by the Santa Fee river, and on the other sides by vacant lands, and since surveyed under the authority of the United States, and lies in township six and seven south, range eighteen, and is known upon the plat of said survey as the claim of Francis R. Sanchez, and which said premises are situate in the county of Alachua, in the Eastern District of Florida aforesaid ; and was also at the same time aforesaid seized and possessed of an undivided estate and interest of fifteen hundred acres, being part and parcel of another tract of land, containing two thousand acres, ceded by the Spanish Government to one Don Jose Simeon San-

chez, and described in said cession as being situate on the Santa Fee river, and bounded on the west by lands of Don Francisco Roman Sanchez, and other sides by said river, and which has since been surveyed under the authority of the United States, and lies in township six and seven south, range eighteen, in the county of Alachua, and is known upon the plat of said survey as the claim of Jose S. Sanchez and others. And that the said Marvin being so seized and possessed as aforesaid, did, on the day aforesaid, bargain, sell and convey to one Leigh Read, of the county of Leon, all of his estate and interest in the said two tracts of land, for the consideration of five thousand dollars, *to be paid* at five years, with annual interest, and *did receive at the time* of said sale and conveyance the promissory note of said Read, and of Noah M. Martin as his surety, for the said sum of five thousand dollars, payable five years after date, with interest annually.

That one year's interest on said note or purchase money was paid by the said Read at the time it became due, and that no part or portion of the principal of the said note or purchase money, or of the interest thereon, except as above stated, was ever paid by the said Read in his lifetime, or by his representative since his death, or by any other person, and that the same is still due and owing.

That Noah M. Martin was induced to become the surety of the said Read, for the payment of the said purchase money, in the full reliance and expectation that the premises purchased by him would always be worth the price agreed to be given, and that the proceeds of a sale of them would always in equity and good conscience be held and considered by the said Read, and by the law of the land, as a sacred fund, for the payment of the said purchase money, in preference to any other debt or claim against the said Read.

Since the sale and conveyance aforesaid to the said Read, and the giving of the said note, to wit: Sometime about the year eighteen hundred and forty, the said Read died seized of the said premises and intestate, leaving heirs surviving, his widow Mary Eliza Read, and an infant daughter named Teresa Bellamy Read, his only heir at law, both of Leon County, in the Territory aforesaid ; and that one Richard H. Bradford, upon the death of said Read, was duly appointed the administrator, and is now the administrator of the estate of the said Read.

That the said purchase money has sometime since become due,

and he has frequently applied to said administrator in a friendly manner, and requested him to pay and discharge the principal and interest thereof, but that the said administrator refuses so to do, and has informed your complainant that the estate of the said Read is insolvent, and that he has not assets in his hands to pay the said purchase money.

That in equity and in good conscience the said lands ought to be held and considered in the hands of the said administrator, and in the hands of the said Teresa Bellamy Read, as a fund for the payment of the said purchase money, in preference to any other claims against the estate of the said Read; and praying that the premises aforesaid may be decreed to be sold, and out of the moneys arising from the sale thereof, he, the said Marvin, may be paid the amount which may then be due him, as and for the purchase money aforesaid.

In 1846, this cause having been transferred to the Circuit Court of St. John's County, Richard H. Bradford filed his answer, insisting that there was no equity shown in the bill; admitting the sale and conveyance, and the execution of the promissory note, signed by Read and Martin, and averring that the estate of Read was hopelessly insolvent. That judgments for large amounts had been recovered against him as administrator, and that said judgments had priority over the claim of Marvin, the complainant; that he had no assets except the lands mentioned in complainant's bill, and some other property of small value; that the widow claimed dower in the lands, and that her claim was to be preferred to others. A separate answer was also filed by the widow; and the infant heir answered the bill by her guardian appointed for the purpose.

In June, 1847, a final decree was made in the cause, by the Hon. THOMAS DOUGLAS, Judge, as follows:

" This cause coming on to be heard this day, and the said parties complainant being represented before this Court, by Messrs. Forward and Fairbanks, their Solicitors, and the said defendants being represented by S. L. Burritt, Esq., their Solicitor, and the bill, answer and evidence in this cause having been read, and argument thereof had, as well on the part of the said complainants as on the part of the said defendants, and the cause having been submitted to this Court for its decree and determination, and this Court having maturely considered the same, doth order, adjudge and decree, that

the lands described in and set forth in the bill of complaint, and whereof conveyance was made to said Leigh Read, deceased, by said William Marvin, on the 12th day of March, eighteen hundred and thirty-nine, are and hereby declared to be subject to the lien of the said complainants for the purchase money thereof; and that the said lands are and shall be deemed to be held by the defendants, subject to such lien, and as a trust fund, out of which the note given by the said Leigh Read, deceased, and Noah M. Martin, for the purchase money, shall be first paid, in preference to any other debts or claims against the estate of the said Leigh Read, deceased.

" And it is, therefore, further ordered, adjudged and decreed, that, unless the said Richard H. Bradford, administrator of Leigh Read, as aforesaid, shall or. do. within sixty days from this date, pay or cause to be paid unto the said complainant, or his solicitor or solicitors, the amount due upon said purchase money which hath been reported, upon reference of the same to the clerk of this Court, as special master, to. be the sum of five thousand, nine hundred and eighty-five dollars and eighty-three cents, with interest from the date hereof until paid ; that the said premises mentioned and described in the bill of complaint shall be sold by or under the direction of the sheriff of the county of Alachua, by virtue of this decree, in the same manner and under the same notice and advertisement, as required by law in case of sales of real estate upon judgments and executions at law, and that the said sheriff execute a deed of said premises, and put the purchaser or purchasers in possession thereof; and the proceeds of such sale shall be applied first to the payment of the taxed costs and expenses of this suit, and then to the satisfaction of the purchase money and interest aforesaid ; and the balance, if any, shall be paid to the said R. H. Bradford, as administrator of Leigh Read, deceased."

From which decree, defendants appealed to this Court.

*Branch* and *Burritt* for Appellants :

The doctrine that the vendor has *a lien upon the land sold* for the purchase money is derived from the civil law. Although it seems to settled and acquiesced in, in England and many of the States of this Union, its introduction was resisted in America until a comparatively recent period. Its policy may be well doubted, and in some States, as in Massachusetts, Connecticut, Pennsylvania and North Carolina,

the doctrine has either been rejected altogether, or exploded after trial.

The decision of this Court will determine whether it is to be adopted in this State and form a part of its laws. It is a new question in this State ; and this Court, being in no way hampered by former decisions, is at liberty to decide as its wisdom shall deem best for the welfare of the State. It being no part of the *common law,* there is no obligation to adopt it, unless its own merits are such as to recommend it.

The spirit of our laws is decidedly against all *secret trusts, liens and incumbrances.* Hence our registration laws, which require all conveyances, incumbrances, trusts and liens on land to be recorded, so that the world may have notice of them. These provisions of the law are to enable purchasers and others to act understandingly, and prevent a person in possession of land from obtaining credit on what does not really belong to him. The doctrine that the vendor has an implied lien on the land is in direct opposition to these wise and wholesome provisions. It allows a vendor to have a mortgage, (as it were,) *secret,* and the existence of which can only be known to the vendor and vendee. It raises a *secret* or *implied trust* in favor of the vendor, which lies dormant and has no tangibility, until called into existence by a court of chancery. Such a doctrine not only, in many instances, works great injury, but is calculated to promote and produce litigation. The vendee being in possession and having an absolute deed, may sell to a third party whose utmost caution could not detect the secret lien existing upon it ; and thus he would buy a law suit even if he did not lose the land.

It also enables the vendee to obtain a false credit by hiding from the eye of the world the incumbrance on his estate.

If the vendor wishes to retain a lien on the land sold, our statute has pointed out the manner in which it may be done. How far it is competent for this Court to evade that statute by allowing it to be done in another and a different manner, it is not necessary in this case to inquire.

In the case before the Court it is not necessary to discuss whether this doctrine of an *implied lien* of the vendor should be recognized or discarded ; for the facts and circumstances of it are such as to take it out of the principle, admitting it to exist.

Admitting, then, that the vendor has a lien on the land sold for the

purchase money, all the authorities agree that this lien *can be waived by the acts of the vendor.*

Appellants contend that he has waived it :

1. By taking the bond or promissory note of the vendee.

The Court will find that the only questions which have been discussed or mooted in the courts of England are, first, whether the lien existed at all, and, second, whether the taking of a separate security, as the bond or note of the vendee, without security, was not a waiver. It will find, also, that whilst it has been decided *that the lien existed,* the question whether taking a bond or note without security is a waiver is still open and undecided. The following cases, decided in England and America, take the ground *that the taking of a separate security, as the note of the vendee, without security, will be a waiver.* The case of Winston *v.* Anson, in 1st Simons & Stuart, cited below, is the latest in England, and of the highest auhority. Winston *v.* Anson, 1 Simons & Stuart R., 434. Tarwel *v.* Heelis, Amb. R., 734. Nairne *v.* Prowse, 6 Vesey R., 752. Wragg *v.* Comptroller General, 2 Dess. S. C. R., 509. Womble *v.* Battle, 4 Iredell E. R., 182. Kauflett *v.* Bowen, 7 Serg. & Raw. R., 64. Semple *v.* Burt, Ibidem. 6 Conn. R., 464. 17 Conn. R., 583.

2. Appellants contend : That Marvin, the vendor, by taking the negotiable promissory note of Read, with Martin as security thereon, and payable at *the expiration of five years,* waived the lien which he might have had on the land.

All the authorities agree that taking the promissory note of the vendee, with a third party as security, is a waiver of the lien. There is not an authority to the contrary. 4 Kent's Comm. 151 and 152. Fish *v.* Howland, 1 Paige R., 20. Gilman *v.* Brown, 1 Mason C. C. R., 191. Brown et al. *v.* Gilman, 4 Wheat. R., 255. 4 Cond. R. 445. Cox *v.* Fenwick, 3 Bibb R., 183. Cole *v.* Scott, 2 Wash. R., 141. Wilson *v.* Graham's Ex., 5 Munf. R., 297. Hardin R., 48. 1 Blackf. R., 416 and 246. Eskridge *v.* McClure and Walker, 2 Yerger, 84. 3 Alabama (N. S.) R., 302. 5 Hammond R., 35. 2 Story's Equity, (sec. 1226, &c.) pages 471—6.

3. Appellants contend : That the Court erred in giving the lien of Marvin, if he had any, a preference over the judgment creditors of Read.

It appears from the bill and answer that the estate of Read is insolvent, and the answer expressly sets forth that there was a large

number of judgments against the estate of Read.    Bayley *v.* Greenleaf, 7 Wheat. R., 46.    5 Cond. R., 229.

The statute requires all conveyances, mortgages and transfers of any interest in real estate *to be recorded, to be good against creditors.* Thompson's Digest, 180.

4. The appellants contend : That the Court below erred in not allowing the claim of Mary Eliza Read, widow of Leigh Read, *to dower* in said lands.

The claim to dower vested in the widow, immediately upon the execution of the deed to Leigh Read, her husband.    It became a *legal claim*, and cannot be postponed to the claim of the vendor, which is *merely equitable*.

The statute points out the only mode in which her claim to dower can be divested.    Thompson's Digest, 179.

*Forward and Marvin,* for Appellees :

The bill states that the complainant (Marvin) in 1839 sold a tract of land in Alachua County to Leigh Read for $5,000, payable in five years, and took Read's note, with the other complainant (Martin) as surety on the note, for the purchase money.    Read afterwards died, having paid no part of the purchase money, and the heir and administrator refusing to pay for the land, this bill is filed to subject the land to the payment of the purchase money.    The principal facts are admitted in the answers.

The complainant's counsel contends—

1st. That the vendor of real estate has in equity a lien upon the land for the purchase money, as against the vendee and his heir and representative.

This lien is created by law, and is an actual interest or right in the land, which cannot be lost or impaired but by agreement.    2 Story's Commentaries on Equity, 462–'3, 475.    15 Vesey Jur., 329, (Sumner's edition.)    1 Schoales & Lefroy, 132.    6 Vesey Jur., 759, 760.    1 Johnson's Chancery, 308.    9 Cowen, 316.

2d. The taking of Martin as surety upon the note does not by itself extinguish the lien or waive it.    The lien, which is a vested right, can be extinguished, lost or waived, only by the *agreement* of the vendor, which agreement is not to be *implied* or *presumed*, but proved *as a fact*.    The inquiry is, as to the *fact* of an *agreement* on the part of the vendor to waive his lien.    If there is *no agreement*,

then there is no waiver. The *vendee*, relying upon the waiver, must prove the *agreement* to *waive.* 2 Story's Equity, 469. 1 Schoale & Lefroy, 132.

The taking of Martin as surety is only evidence, *testimony tending* to prove another *fact*, the agreement to waive, and is not sufficient ALONE and without other circumstances, to establish the fact that the vendor *agreed* to waive the lien. 2 Story's Equity, 469. 15 Vesey, 329, great case. 3 Russell, 488, in 3 Cond. Eng. Chancery, 495. 1 Schoales & Lefroy, 132. 1 Brown's Chancery, 372, note A, to the case of Blackburn *v.* Gregson, (Perkins' American edition.)— 2 Ves. & Bea., 306. 9 Cowen, 316. Cross on Law of Lien, 89, 90, 91, 92, 93.

The case of Gilman *v.* Brown, in 1 Mason, 212, is new and unprecedented. It is the opinion of an able judge, but unsupported by previous authorities, and was uncalled for by the facts of the case.

3d. The surety (Martin) is entitled to have the land sold. Stump *v.* Rogers, 1 Ohio Reports, 225. Green *v.* Crocket, 1 Dev., and Batt. Eq., 390. Arnold *v.* Hicks, 3 Iredell Eq., 17. 1 Randolph, 53. 1 Deveraux, 151. 2 Bland's Chancery, 199, note C.

HAWKINS, Justice, delivered the following opinion :

The questions arising in this case for the decision of the. Court, are these : 1st. Can a vendor enforce a specific lien in equity against a vendee for the land sold, the vendor giving the vendee an absolute deed in fee simple, and in return therefor, taking the promissory note of the purchaser, with a third person thereon as security ?

2d. Can the surety, without having paid the purchase money, be entitled to have the lands (so sold) set apart as a specific fund for the payment of the note ?

We have given the subject the consideration due to its importance, and more especially as it is the first case that has arisen in our courts involving a solution of the above propositions.

The right of the vendor to an equitable lien upon the property sold, seems to have derived its source from the civil law, and constituted what was termed a *tacit hypothecation*, or secret mortgage. It has been much discussed in the courts of England and this country, and the doctrine exists and is fully sustained in England and in most of the States of the Union ; but difficulties have arisen out of the

question, what shall constitute a waiver of the implied lien? This, indeed, is the very question before the Court.

During the argument, all the British cases *pro* and *con*, both before the Revolution and since, having a bearing upon the question, were cited and commented upon with great ability, and it seems they cannot be very easily reconciled with each other. Judge Story, however, remarks, in Gilman *v.* Brown, that "on a careful examination of all the authorities, he does not find a single case in which it has been held, if the vendor takes a collateral security, binding others as well as the vendee—as for instance a bond or note with a surety or an endorser, or a collateral security by way of pledge or mortgage—that, under such circumstances, a lien exists on the land itself." If such be the case, the American authorities are not *contra* but *ultra* merely those of England.

Without going into detail as to the British authorities, it will be sufficient as to them to quote the neat and precise summary of Chancellor Kent. He remarks: "It has been a question much discussed as to the facts and circumstances, which would amount to the taking of security from the vendee, so as to destroy the existence of the lien. In several cases it is held, that, taking a bond from the vendee for the purchase money, or the unpaid part of it, affected the vendor's equity, as being evidence that it was waived; but the weight of authority and the better opinion is, that, taking a bond, note, or covenant from the vendee for the payment of the money, is not of itself an act of waiver of the lien, for such instruments are only the ordinary evidence of the debt. Taking a note, bill, or bond, with distinct security, or taking the distinct security by itself, either in the shape of real or personal property, from the vendee, or taking the responsibility of a third person, is evidence that the seller did not repose upon the lien, but upon independent security; and it discharges the lien. Taking the deposit of stock is also a waiver of the lien, and, notwithstanding the decision of the Master of the Rolls, in Grant *v.* Mills, holding that a bill of exchange, drawn by the vendee, and accepted by him and his partner, did not waive the lien, the *sounder doctrine and the higher authority is*, that, taking the responsibility of a third person for the purchase money, is taking security, and extinguishes the lien." 4th Kent's Com., 152, 153.

The text of Chancellor Kent is fully sustained by the American authorities. Indeed, so far as we have been able to extend our re-

searches, there appears a uniform current of decisions going to establish the doctrine, that the taking of independent or collateral security is a waiver of the lien.

In Virginia, it has been decided directly; Judge Pendleton observing, that "If he (vendor) hath taken a security, or the vendee hath sold to a third person without notice, the lien is lost." Cole *v.* Scott, 2 Wash. Reps., 141. So, too, in the case of Wilson *v.* Graham's Ex'rs., 5 Mumford, 297, 299. 2 Tucker's Notes, 454.

The doctrine of lien and this principle of waiver certainly exists in several other States, viz : Tennessee, Ohio, Kentucky, Alabama, Georgia, Indiana, Mississippi, New York, and probably others beside. See Eskridge *v.* McClure & Walker, (Haywood & Whyte Justices,) 2 Yerger Rep., 84. Williams *v.* Roberts, 5 Hammond R., 35. Cox *v.* Fenwick, 3 Bibb, 183. Hardin Rep., 48. 3 Alabama (N. S.,) 302. 3 Kelly's Georgia Rep., 345. 1 Blackford, 249, 416, *Evans v. Goodlet.* Lagon et al., *v.* Badallet and others. Clower *v.* Rawlings, 9 Smedes & Marshall, 128, and Fish *v.* Howland, et al., 1 Paige Ch. R., 20, where the British authorities are all reviewed, and the subject ably discussed by Chancellor Walworth.

Judge Story, a portion of whose opinion we have already quoted, (Gilman *v.* Brown, 1 Mason, 191,) has given the sanction of his name—a name carrying with it the greatest possible respect and veneration—to this principle of waiver, by the taking of collateral security. The case of Gilman *v.* Brown was taken to the Supreme Court of the United States, where the doctrine of Judge Story, as to this waiver, received confirmation from that Court, Chief Justice Marshall delivering its opinion. He remarks : " The notes, too, for which the vendors stipulated, are to be endorsed by persons approved by themselves. This is a collateral security, on which they relied, and which discharges any implied lien on the land itself for the purchase money. We think this, on principles of English law, a clear case of exemption from lien." Brown *v.* Gilman, 4 Wheat., 455. We have already seen that Chancellor Kent adopts an adverse principle to that of Lord Eldon, as to waiver of the lien, and coincides with the Supreme Court and Judge Story.

With such an array of opinions and decisions pronounced by judges, eminent for all that is great and illustrious in jurisprudence, a court can feel no diffidence, difficulty, or solicitude, as to arriving at a proper conclusion.

We are not prepared, however, to go as far as some decisions, which declare, that the taking separate or independent security is, *per se*, or *ex proprio vigore*, a waiver of the lien of the vendor upon the land sold; but we adopt the maxim of *in medias res* as most conducive to justice, and say this, that where a separate or independent security is taken by the vendor, other than the personal security of the vendee, it is *prima facie* evidence of a waiver of the equitable or implied lien upon the land sold, and the *onus* is upon the vendor to prove that it ought not to have that effect.

To enable vendors and purchasers to understand their respective rights, it is certainly well that some explicit and general rule, one easily understood and as easily followed, should be declared; thereby obviating in numerous instances the necessity of a resort to a Court of Chancery by parties, to have their several rights subjected to the construction of that Court, upon the varying and peculiar circumstances of each particular case.

We may here be permitted to remark, that such a rule seems based upon sound policy. It is very true, that when an individual parts with his land, he should receive the purchase money—that is sheer justice; and as long as he indicates by his act—for instance, the simply taking the bond or note of the purchaser—that he relies upon the land itself as a means of payment, the law says, he shall retain a specific lien upon the property sold, subject, of course, to have it defeated by the intervention of creditors or purchasers without notice. But when he carves out an independent security for himself, in exchange for the land sold—when he creates for himself a distinct and separate fund to which he can look for payment—when he gives an absolute deed for the land, thereby rendering it subject to other claims and the contingency of sale, it does appear that the vendor has no right to complain. The evil, if any, is easily averted by ordinary care, either by taking a mortgage, which on being recorded is notice to all the world, thereby carrying out the policy of our registration laws, and in many cases preventing third persons from giving credits to the vendee, on the faith and security of the very land sold; or by retaining the title, simply giving a bond for a conveyance, upon the payment of the purchase money. These modes are familiar to every one, and generally are pursued in those every day transactions when real property is bought and sold. If the mode and manner of payment are all that are intended by the taking of a

note, with an endorser upon it, it would seem they would be sufficiently indicated without invoking the liability of a third person, who frequently would feel that his contract was something more than mere form ; and certainly the simple note or bond of the purchasers would be quite sufficient to set forth the amount, place and time of payment.

It is said, too, that because a party takes one security, it is not a *sequitur* that he relinquishes another.   Very true, but then let him fashion his contract accordingly, and thereby rebut the inference and presumption raised by the law ; unless he do so, in the words of Judge Story, " the rule may properly apply, that *expressum facit cessare tacitum,* and where the party has carried out his own security, the law will not create another in aid."   This was manifestly the opinion of Sir William Grant in a recent case, where he asks, " If the security be totally distinct and independent, will it not then become a case of substitution for the lien, instead of a credit given because of the lien ?"

An argument upon the plea of the justice of the case was strongly pressed and urged upon the Court.   Such an appeal must, at all times, commend itself most favorably to the consideration of a tribunal, whose duty it is to mete out even-handed justice to the parties litigant before it.   But the Court cannot enforce a legal or equitable right, where it is clearly waived ; and more especially where the rights of third persons are concerned, as the record in this case clearly shows.   The administrator of the estate of Reed possesses the character of a trustee for all interested or having claims against it, and he states that there are heavy judgments.   Though that fact has exercised no influence upon our decision, yet it affords an argument by way of response to the plea of justice, so strenuously contended for ; for where there is equity, there must be equality.   Arguments, too, upon the hardship of a case are, Chancellor Kent says, " the quicksands of the law," and if allowed to prevail, would soon choke up and destroy all established precedents.

As to the second proposition, we are not aware that the surety, Martin, can successfully invoke the aid of a court of equity to set apart the land sold by Marvin, as a specific fund for the payment of the purchase money, where the vendor has not retained the title, but parted with it absolutely, and where also the surety has not paid the money or any part of it.

Bradford, Adm'r, et al. *vs.* Marvin and Martin.—Opinion of Court.

Courts of equity hold sureties, entitled *upon payment* of the debt due by the principal to the creditor, to have the full benefit of all the collateral securities, both of a legal and equitable nature, which the creditor has taken as an additional pledge for his debt. 1 Story's Com., 477. So the surety, who *has paid the debt of the principal*, is entitled to stand in the place of the creditor, as to all the securities for the debt held or acquired by the creditor, and to have the same benefits from them as the creditor. Pr. & Sur., 252. Bing. on Surety, 352.

The surety, if he has apprehension of loss or injury from the delay of the creditor to enforce the debt against the principal debtor, may file his bill, *quia timet,* to compel the debtor to discharge the debt, provided the surety's obligation to pay has become absolute. So he may compel the creditor to sue the principal, and collect the debt due from him in discharge of the surety. 2 Story Eq., 144.

Martin, in this case, does not seek to be substituted to the rights of Marvin, upon the plea of having paid the money, but asks that the land be held primarily liable. But suppose he had paid the money, could he, upon the principle of subrogation, have any greater rights than the creditor, Marvin, himself? If Marvin had retained the title in himself, questions involving the specific execution of agreements, and others, might have arisen; but these are not now before the Court.

There were several cases cited by counsel for the appellees, which they contended would authorize a sale of the land to save the surety, Martin, harmless. They were cases, where either the *money was paid* by the surety, or where the *title was retained by the vendor,* and turned virtually upon the principle of substitution and subrogation.— We have given them a careful perusal, and do not regard them as at all analagous to the case at bar.

With these views, we are of opinion that the decree of the Court below was erroneous, and should be set aside. It is, therefore, ordered, adjudged and decreed, that the decree rendered in the Court below be set aside, vacated and annulled.

Justice LANCASTER dissented.